53 So.2d 533 (1951)
KILBEE
v.
STATE.
Supreme Court of Florida, Special Division B.
July 3, 1951.
*534 Garland W. Spencer, Sanford, and Sam Bucklew, Tampa, for appellant.
Richard W. Ervin, Atty. Gen., Reeves Bowen, Asst. Atty. Gen., and William W. Judge, Daytona Beach, for appellee.
CHAPMAN, Justice.
The appellant, W.G. Kilbee, was indicted for the larceny of six hogs by a grand jury of Volusia County, Florida. He was later placed upon trial and a jury returned a verdict of guilty as charged. A motion for new trial was made by counsel and later denied by an order of the trial court, when appellant was adjudged guilty and sentenced to serve a period of two years in the State Prison at hard labor. The defendant below appealed. It was alleged that the six hogs were stolen by the defendant-appellant in Volusia County, Florida, on November 8, 1949. The hogs were described viz.: One black gilt hog marked under square in each ear; three hogs, each marked cropsplit in one ear, and under square in other ear; one black barrow hog marked with bolt mark in each ear; and one gilt hog marked crop-under bit in one ear and crop under slope in other ear.
The record discloses substantially the following factual situation: One W.M. Mixon, during 1946, bought certain hogs of described marks "and all unmarked pigs and shoats belonging to the sows of the above marked hogs" owned by the Phillip A. Leonardy estate. The bill of sale as given by the administrator to Mixon failed to recite the exact hog range where the described hogs were located or the county or counties in which the hogs of the described marks usually ranged, but the parol testimony disclosed that the hogs in question were located about Osteen in southern Volusia County. The hogs, it was alleged, were stolen on November 8, 1949, and at the time ranged from Osteen, around Farmington, into Cow Creek, in the vicinity of Cook's Point, and upon lands of appellant referred to as Summerlin pasture, being adjacent to Cook's Point. Mr. Mixon, for a short time after acquiring the bill of sale, worked the hogs but sustained an injury and was forced to have others assist in marking the hogs, feeding them, and doctoring them for screw worms from time to time.
Some few months prior to March, 1947, Archie Ward worked on a share basis the hogs acquired by Mr. Mixon of the Phil Leonardy estate. These hogs ranged in the Summerlin pasture owned by the appellant. Some of the hogs were penned when the appellant, Mr. Mixon, Archie Ward and Aubrey Partin met at the pens and appellant paid Archie Ward $60 for his interest in the Mixon hogs. As a result of the trade, appellant testified that a one-half interest in the hogs then in the Summerlin pasture became his property and he acquired on the same date a remaining one-half interest of Mixon to the Leonardy stock of hogs (during 1947) ranging in the pasture. He (the appellant) then asserted ownership of a three-fourths interest in said stock of hogs. Ward and Mixon, however, contradicted the appellant's testimony as to the exact interest acquired by the appellant in the Mixon hogs ranging in the Summerlin pasture. Aubrey Partin testified that Mixon told him one-half of the hogs ranging in the Summerlin pasture belonged to Kilbee.
*535 Appellant's testimony as to a three-fourths interest in the stock of hogs ranging in the Summerlin pasture is corroborated by a check dated March 11, 1948, payable to Bill Mixon in the sum of $45 and drawn by Kilbee; another check drawn by Kilbee, dated April 8, 1948, and payable to W.M. Mixon in the sum of $62.50; a third check payable to W.M. Mixon in the sum of $105 dated August 9, 1948. The amounts of these checks were paid to Mixon. The cost of wire in the sum of $90 was paid equally by Mixon and Kilbee to fence a twenty acre tract owned by Mr. Brewer and situated in the Summerlin pasture. The proceeds from hogs butchered or sold by Kilbee from the Summerlin pasture were paid one-half to Mixon and Kilbee retained one-half. Kilbee testified that Mixon was entitled to only one-fourth of the proceeds arising from the sale of the hogs or when butchered, but, because of Mixon's physical condition, he gave him one-half  but the correct interest was one-fourth.
The appellant acquired the Summerlin pasture lands situated in Volusia County during the year 1942. He placed a stock of hogs on the pasture shortly after acquiring it, where they continued until this law suit developed, except Kilbee was planting some of the pasture lands in Torpedo grass for cattle and woods hogs rooted up and destroyed the grass, which cost him approximately $80 per acre to set. He adopted the policy of removing all hogs from the Summerlin pasture and found it a difficult task to catch and remove them, but when caught they were transferred to a pasture near Geneva in Seminole County owned by him. The hogs in the Summerlin pasture would feed on acorns falling from the oaks and this feed alone was sufficient to make the hogs marketable. It appears by the record that the appellant had been in the cattle and hog business for approximately forty years  his father before him followed the same line and in the same area. He owned pastures situated in Volusia, Seminole and Brevard Counties. He owned approximately 25 to 35 different marks used to mark his stock of hogs and cattle about the several pastures situated in Volusia, Seminole and Brevard Counties. Kilbee owned stocks of hogs in the several marks as described in the indictment under which he was tried and convicted
In the record are exhibits or certificates to the effect that the described marks of the six hogs referred to in the indictment are now used by owners of livestock in other counties of Florida, as appears among the public records thereof. Owners of livestock in some dozen counties, or more, have similar marks for their livestock. Kilbee testified, and it is not disputed, that he now owns stock in the several marks of the hogs described in the indictment. V.P. Allman, the prosecuting witness, testified that he owned hogs marked similar to those described in the indictment, with one or two possible exceptions.
W.M. Mixon, on July 21, 1948, sold the prosecuting witness, V.P. Allman, all range hogs of certain marks "* * * and the unmarked pigs and shoats belonging to the marked hogs." Some of these hogs ranged in the Summerlin pasture owned by the appellant. Allman had been in the hog business all his life but owned no land upon which they could range and the marked hogs purchased by him from Mixon ranged in part, in the Summerlin pasture owned by the appellant. Kilbee was improving the pasture for his cattle by planting Torpedo grass which the hogs destroyed. Allman needed a range for his hogs and Kilbee wanted the hogs removed from his pasture. Friction therefore arose between Allman and Kilbee. Trespass signs by Kilbee placed about his property were torn down; Allman took pens upon the land in which to place his hogs when caught; a gate was torn down about the land and a stock gap substituted; Kilbee ordered Allman from the pasture; Allman refused to leave; Allman continued to work his hogs ranging on Kilbee's land over his protest; he refused or declined to pay Kilbee rentals for his stock about the property; the men clashed when Allman had a pistol and harsh words were used. Allman refused to pay Kilbee rent for his stock or to move his hogs from the pasture.
On Tuesday, November 8, 1949, Kilbee and hands loaded about 45 head of hogs in *536 a truck at his pens on Nigger Ridge pasture near his home at Geneva, Seminole County, Florida, and sent the same by his wife and nephew to Webster for the stock market sale. The hogs were sold and commingled with other hogs in a pen at the market, when Mr. V.P. Allman appeared at the market and pointed out six hogs in the pen which he claimed as his property. The six hogs so claimed, with appropriate marks, are described in the indictment. Allman testified that he saw two of the described hogs at Cook's Point in Volusia County on Sunday, November 6, 1949. Another witness with Allman at the time testified as to the two hogs being at Cook's Point. The exact distance necessary to travel from Cook's Point in Volusia County to the appellant's stock pens at Nigger Ridge near Geneva is not clear from the record. Allman claimed ownership by the earmarks and color of the two hogs. It does not appear that further or additional searches were made for these hogs in Summerlin pasture after the two witnesses saw them on Sunday, November 6, 1949. One witness and the defendant testified that Cook's Point, on November 8, 1949, was under water. This was not contradicted.
The controlling question presented by the record is whether or not the State of Florida carried its burden of establishing the ownership of the hogs described in the indictment as being in V.P. Allman. It is fundamental that a person charged with crime is entitled to the presumption of innocence. The burden of proof of every essential element of the crime is cast upon the State and the presumption of innocence accompanies a defendant through each step of the trial until the same is overcome by testimony establishing the guilt of the accused beyond a reasonable doubt. Roe v. State, 96 Fla. 723, 119 So. 118.
Larceny is the felonious taking and carrying away from any place the personal property of another, without his consent, by a person not entitled to the possession thereof, with the intent to deprive the owner of the property and to convert it to the use of the taker or some person other than the owner. Brent v. State, 127 Fla. 626, 173 So. 675. It is essential in order to sustain a conviction of larceny that the evidence adduced by the State establishes beyond a reasonable doubt that the property was taken animo furandi. Helton v. State, 135 Fla. 458, 185 So. 864. Likewise, it is well established law that where one takes the property of another, honestly believing that he has a right to it, or, in other words, under a bona fide claim of right, there can be no larceny. Charles v. State, 36 Fla. 691, 18 So. 369. We have reaffirmed on many occasions the rule supra enunciated in Charles v. State.
V.P. Allman testified that he was the owner of the hogs described in the indictment. This ownership, according to his testimony, rests on the bill of sale of the Phil Leonardy stock of hogs given to him under date of July 21, 1948, by W.M. Mixon. Mr. Allman and another witness identified the six hogs in the Webster market on November 8, 1949, by their marks. Two State witnesses, Allman and Nicholson, testified that on Sunday, November 6, 1949, at Cook's Point in Volusia County they saw one black barrow marked "bolt" in each ear; also one gilt marked crop  under bit in one ear and crop under slope in the other,  the last mark being Barney Beck's hog mark. The two hogs were about a year old and came from the same litter. On cross-examination Mr. Allman admitted that the appellant owned "woods hogs" which ranged about Cook's Point during November, 1949. Another State witness, Edward Yarborough, (Tr. 96 to 113) testified that he worked for the appellant and helped catch the 45 hogs in the pen near Geneva and all the hogs were caught on Nigger Ridge in Seminole County and placed in the pen and from the pen sent by truck to Webster and all of these hogs belonged to W.G. Kilbee.
The appellant's ownership of the hogs, according to the testimony, arises from two sources: First, he owned hogs and cows in November, 1949, ranging about three pastures located in Volusia County, two in Seminole and one in Brevard. He placed stock hogs of different marks in the Summerlin pasture in Volusia County *537 in 1942. He later caught and removed many of these hogs to his Nigger Ridge pasture in Seminole County. He was the owner of from 25 to 35 different hog marks at the time of the trial. These different marks were accumulated by him during the 40 year period he had engaged in the livestock business. He owned hogs marked in the same mark as the Leonardy stock during the life of Phil Leonardy. V.P. Allman claimed ownership of the hogs described in the indictment under the bill of sale date July, 1948, from Mixon, being the Leonardy "marks". The hogs described in the indictment were in the marks owned by the appellant.
The second source of appellant's ownership of the hogs described in the indictment stems from his acquisition of the Archie Ward interest derived through W.M. Mixon. On the point of the exact interest transferred by his verbal agreement among the parties there is a conflict in the testimony. Ward and Mixon testified that the title to the described hogs did not pass to the appellant by their oral agreement. On the other hand, Aubrey Partin testified that Mixon told him that Kilbee owned a three-fourths interest in the woods hogs ranging in the Summerlin pasture and that he (Mixon) owned a one-fourth interest. Kilbee testified that he owned a three-fourths interest in the Mixon hogs. He and Mixon bought $90 worth of wire with which to fence a Mr. Brewer's 20-acre tract situated in the pasture. Mixon paid $45 and Kilbee paid $45. Other checks payable to Mixon drawn by Kilbee are in the record. These checks were for Mixon's interest in hogs sold or butchered by appellant as Mixon had sustained an injury and could not work the hogs.
Some two or three witnesses, employees of the appellant, testified that they assisted in the loading of the 45 hogs into the appellant's truck around 7:00 o'clock A.M. on November 8, 1949. These witnesses corroborated the State witness, Ed Yarborough, to the effect that the hogs so loaded were caught on Nigger Ridge pasture in Seminole County and placed in the pen near appellant's home at Geneva and the hogs sold at Webster were the property of Kilbee. The general reputation of Kilbee for honest and upright business dealings, as well as for truth and veracity in the community where he resides, was vouched for by many citizens and officials of Seminole County. We are not required on this appeal to determine which party, that is Allman or Kilbee, has the stronger claim of ownership of the hogs. The law provides a different forum in which to adjudicate conflicting claims of ownership.
For many years it has been the settled law of Florida that if after a studious and careful consideration of all the evidence it appears from the record that the ends of justice will be best subserved in granting a new trial because of the insufficiency of the testimony adduced or relied upon by the prosecution to establish one or more essential facts necessary to constitute the crime as charged, then, under these conditions and circumstances, in the administration of justice it becomes the duty of this Court under the law to reverse the cause for a new trial. Lowe v. State, 154 Fla. 730, 19 So.2d 106, and Cordell v. State, 157 Fla. 295, 25 So.2d 885.
The judgment appealed from is reversed and a new trial awarded.
SEBRING, C.J., and THOMAS and ADAMS, JJ., concur.